UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

　　　　　　　　　Plaintiff,

　　　　　v.

BLUE BOTTLE LIMITED
and MATTHEW C. STOKES

　　　　　　　　　Defendants.

---

**07 CV 1380**

Civil Action No.



## COMPLAINT

## SUMMARY

1.　　This matter involves an ongoing fraudulent scheme conducted by Blue Bottle

Limited ("Blue Bottle"), a Hong-Kong chartered firm that purports to be located in London,

England, and its owner and chief executive officer, Matthew Charles Stokes ("Stokes"),

during the period August 2006 through the present time.

2.　　Immediately prior to the publication of news releases by at least 12 different U. S.

public companies, Defendant Blue Bottle repeatedly traded in the securities of those

companies, including options trading and long and short equities trading.

3.　　Upon information and belief, the Defendants have gained access to material non-

public information contained in these news releases through fraudulent devices, schemes, or

artifices, which may include, but are not limited to, hacking into computer networks or

otherwise improperly obtaining electronic access to systems that contain information about

imminent news releases.

4.     Upon information and belief, with the material non-public information in hand, the

Defendants repeatedly traded ahead of the public dissemination of that information,

realizing profits of over $2.7 million.

5.     By engaging in the conduct described in this Complaint, Defendants Blue Bottle and

Stokes violated, and unless restrained and enjoined will continue to violate, Section 17(a) of

the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5

[17 C.F.R. § 240.10b-5], thereunder.

## JURISDICTION

6.     The Commission brings this action, pursuant to Section 20 of the Securities Act [15

U.S.C. § 77t(b)] and Sections 21(d) and (e) and 21A of the Exchange Act [15 U.S.C. §§

78u(d) and (e) and § 78u-1], to enjoin such acts, practices, and courses of business; obtain

disgorgement and civil penalties; and obtain other appropriate relief.

7.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities

Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8.     Certain of the acts, practices, and courses of business constituting the violations

alleged herein occurred within the Southern District of New York and elsewhere, and were

effected, directly or indirectly, by making use of the means and instrumentalities of

interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS

9.    Blue Bottle Limited is a corporation chartered in Hong Kong and was incorporated

through a Memorandum and Articles of Association dated August 30, 2006.  In documents

submitted in connection with the opening of an account at Interactive Brokers LLC

("account opening documents"), Blue Bottle identified its principal address as 1 Kings

Avenue, Winchmore Hill, London, N21 3NA, London.  While Blue Bottle's Memorandum

and Articles of Association do not identify Blue Bottle's business, the account opening

documents identify its business as accounting services and tax consultation.

10.    Matthew Charles Stokes, age 30, is a citizen of Guernsey.  Stokes is the sole owner

and chief executive of Blue Bottle; however, others may have a direct or indirect interest in,

control, or assist in the control of the day-to-day conduct of Blue Bottle and its business.  In

the account opening documents, Stokes, or someone purporting to be Stokes, listed his

residential address as 1 Kings Avenue, Winchmore Hill, London, N21 3NA, London.  That

address, however, is occupied by a firm of accountants and an insolvency practitioner.  Blue

Bottle's Memorandum and Articles of Association identifies an address for Stokes in Dubai,

United Arab Emirates.

## RELEVANT ENTITIES

11.    Interactive Brokers LLC is headquartered in Greenwich, Connecticut, and is an on-

line broker registered with the Commission.  The Defendants opened and maintain a margin

account at Interactive Brokers through which Blue Bottle has done the trading in question.

12.    Bank of Cyprus Limited is located in Nicosia, Cyprus.  Blue Bottle has a bank

account at the Bank of Cyprus.  Money from this account has been transferred into

Defendants' Interactive Brokers trading account, and money from the trading account has been transferred into this bank account.

## SELECT SECURITIES IN WHICH DEFENDANTS HAVE TRADED

13.   Achillion Pharmaceuticals, Inc. is a Delaware corporation headquartered in New Haven, Connecticut. Achillion's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act. Achillion's common stock trades on the NASDAQ under the ticker symbol ACHN.

14.   AllianceBernstein Holding L.P. is a Delaware limited partnership headquartered in New York, New York. AllianceBernstein's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act. AllianceBernstein's common stock trades on the New York Stock Exchange under the ticker symbol AB, and options for its common stock trade on the Stock Exchange, Chicago Board Options Exchange, and Philadelphia Stock Exchange.

15.   Allscripts Healthcare Solutions, Inc. is a Delaware corporation headquartered in Chicago, Illinois. Allscripts' common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act. Allscripts' common stock trades on the NASDAQ under the ticker symbol MDRX.

16.   BJ's Wholesale Club, Inc. is a Delaware corporation headquartered in Natick, Massachusetts. BJ's Wholesale's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act. BJ's Wholesale's common stock trades on the New York Stock Exchange under the ticker symbol BJ, and options for its common stock trade on the Philadelphia Stock Exchange, International Securities Exchange, Pacific Stock Exchange, and Boston Options Exchange.

17.     Brady Corporation is a Wisconsin corporation headquartered in Milwaukee, Wisconsin.  Brady's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Brady's common stock trades on the New York Stock Exchange under the ticker symbol BRC.

18.     CACI International Inc. is a Delaware corporation headquartered in Arlington, Virginia.  CACI's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  CACI's common stock trades on the New York Stock Exchange under the ticker symbol CAI, and options for its common stock trade on the Chicago Board Options Exchange, Philadelphia Stock Exchange, and Pacific Stock Exchange.

19.     Hornbeck Offshore Services, Inc. is a Delaware corporation headquartered in Covington, Louisiana.  Hornbeck Offshore Services' common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Hornbeck Offshore Services' common stock trades on the New York Stock Exchange under the ticker symbol HOS, and options for its common stock trade on the Philadelphia Stock Exchange, Chicago Board Options Exchange, and Intercontinental Exchange.

20.     LeCroy Corporation is a Delaware Corporation headquartered in Chestnut Ridge, New York.  LeCroy's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act.  LeCroy's common stock trades on the NASDAQ under the ticker symbol LCRY.

21.     Millipore Corporation is a Massachusetts corporation headquartered in Billerica, Massachusetts.  Millipore's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Millipore's common stock trades on the New York

Stock Exchange under the ticker symbol MIL, and options for its common stock trade on the Chicago Board Options Exchange, Philadelphia Stock Exchange, International Securities Exchange, Pacific Stock Exchange, and American Stock and Options Exchange.

22.     Odyssey Healthcare, Inc. is headquartered in Dallas, Texas. Odyssey Healthcare's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act. Odyssey Healthcare's common stock trades on the NASDAQ under the ticker symbol ODSY, and options for its common stock trade on the Philadelphia Stock Exchange, Chicago Board Options Exchange, Pacific Stock Exchange, and American Stock and Options Exchange.

23.     Symantec Corporation is a Delaware corporation headquartered in Cupertino, California. Symantec's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act. Symantec's common stock trades on the NASDAQ under the ticker symbol SYMC, and options for its common stock trade on the Philadelphia Stock Exchange, Chicago Board Options Exchange, American Stock Exchange, Boston Options Exchange, Intercontinental Exchange, and Pacific Stock Exchange.

24.     RealNetworks, Inc. is a Washington corporation headquartered in Seattle, Washington. RealNetworks' common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act. RealNetworks' common stock trades on the NASDAQ under the ticker symbol RNWK, and options for its common stock trade on the Chicago Board Options Exchange.

# FACTS

## In Opening Their Brokerage Account,
## The Defendants Provided False Information And Documentation

25.    In October 2006, the Defendants began efforts to open an account in the name of

Blue Bottle Limited at Interactive Brokers LLC, an on-line U.S. broker.

26.    To open an account at Interactive Brokers, the Defendants were required to submit

information and documentation about Blue Bottle, but the required information was limited

because of Blue Bottle's status as an organization.  Stokes also was required to submit

additional personal information and documentation because he was identified as the CEO,

owner, trader, treasurer, and secretary of Blue Bottle.

27.    In the account opening documents, Blue Bottle's business is identified as accounting

services and tax consultation.

28.    In the account opening documents, Stokes, or someone purporting to be Stokes,

provided incorrect personal information, including his home telephone number and address

(1 King's Avenue, Winchmore Hill, London, N21 3NA, United Kingdom).

29.    In November 2006, Interactive Brokers mailed an item to Stokes' address, but it

could not be delivered.  When Interactive Brokers tried to call Stokes at the telephone

number provided in connection with the account opening, the number did not work.

Interactive Brokers then e-mailed Stokes.  In approximately mid-December 2006,

Interactive Broker's records indicate Stokes, or someone purporting to be Stokes,

represented by email that he would update this contact information.  Stokes never provided

updated contact information to Interactive Brokers.

30.     Similarly, the residential address that Stokes, or someone purporting to be Stokes, provided to Interactive Brokers is identified on London's electors' list as the address of an accounting firm and an insolvency practitioner.

31.     To open an account, Interactive Brokers required Stokes to provide proof of his residential address at 1 King's Avenue, Winchmore Hill, London, N21 3NA, United Kingdom (which was also identified as Blue Bottle's principal place of business in account opening documents).  Stokes, or someone purporting to be Stokes, submitted a "Thames Water Utilities Ltd" bill with the Winchmore Hill address as proof of residential address.

32.     The water bill that Stokes, or someone purporting to be Stokes, submitted is fake. First, the bill submitted to open the Interactive Brokers account contained a six digit account number; Thames Water account numbers are ten digits long.  Second, the remittance address listed in the phony water bill is incorrect.  Third, the meter reading and dates in the phony water bill are not presented in the format used by Thames Water Limited.  Fourth, Thames Water Limited did not create a water bill for the listed address on the date of the phony water bill.  Fifth, the name of the occupant(s) of the Winchmore Hill address during this period was not Matthew Stokes.

33.     Stokes, or someone purporting to be Stokes, also told Interactive Brokers that Blue Bottle has a branch office at 41 Duke Street, Edinburgh EH6 8HH, but 39-43 Duke Street is occupied by a firm of accountants.

34.     The internet protocol address information submitted in connection with log-ins to the Blue Bottle account and in email headers in communications with Interactive Brokers have not been from any location in the United Kingdom.

35. Interactive Brokers' sole communication with the Defendants has been through emails.

36. The Commission believes, and avers, that the Defendants took active steps to limit the amount of information provided, and provided false information, to open the account at Interactive Brokers, and the Defendants have taken, and are taking, active steps to conceal their identity and true location in furtherance of a scheme to violate the federal securities laws.

### The Defendants' Unusual Trading
### In Advance Of Scheduled And Unscheduled News Releases

37. The Defendants initially funded their account with a wire transfer from the Bank of Cyprus on November 15, 2006, and began trading through their Interactive Brokers account shortly thereafter.

38. In January 2007, the nature of the Defendants' trades changed. The trades more frequently involved the stock and/or options of a U.S. public company just before that company released business and financial information likely to effect market values. The typical size of the Defendants' positions increased, the trades increasingly involved options, and the trades often resulted in significant profits.

39. All of the identified trading was just before the public dissemination of a news release and appears to have been based on, and intended to profit from, the news contained in the release.

40. Specifically, when the release contained positive news and the market price likely would increase, Blue Bottle purchased the issuer's stock and/or purchased call options. A call option is a contract that provides the buyer the right, but not the obligation, to buy an agreed quantity of an underlying stock by a date (the expiration date) for a certain price (the

strike price). The buyer of a call option generally expects the price of the underlying security will rise, allowing the buyer of the call option to make a profit from the difference between the strike price (plus the cost of the option) and the higher market price. A call option is in-the-money if the strike price is less than the market price of the underlying security. A call option is out-of-the-money if the strike price is more than the market price of the underlying security. In U.S. markets, each call option contract generally requires delivery of 100 shares of the underlying security.

41.     On the other hand, if the release contained negative news and the market price likely would decrease, Blue Bottle purchased put options and/or made short sales of the stock. A put option is a contract that provides the buyer the right, but not the obligation, to sell an agreed quantity of an underlying security by a date (the expiration date) for a certain price (the strike price). The buyer of a put option generally expects the market price of the underlying security will decline, allowing the buyer of the put option to make a profit from the difference between the strike price (less the cost of the option) and the lower market price. A put option is in-the-money if the strike price is more than the market price of the underlying security. A put option is out-of-the-money if the strike price is less than the market price of the underlying security. In U.S. markets, each put option contract generally requires delivery of 100 shares of the underlying stock. A short sale is the opposite of purchasing a stock, in that a short seller borrows shares (for a fee) and sells, anticipating that the price of the shorted stock will fall, and it will be possible to buy shares to "cover" the short sale at a price lower than the short sale price, thereby making a profit. Thus a short seller takes a fundamentally negative, or "bearish," stance.

42.     In all cases, Blue Bottle has opened and then closed its positions within two or three

trading days, maintaining the position only for the period immediately before and after the

announcement.

43.     Some of the positions involved options contracts that were set to expire and become

worthless within a few days of the purchase. Additionally, at the time Blue Bottle

purchased them, some of the options contracts were out-of-the-money and, therefore, of

limited value when purchased, unless the stock's market price changed because of a material

event, such as a significant news release.

44.     The Defendants engaged in suspect trading in a number of companies' securities,

including, but not limited to:

### Trading In BJ's Wholesale (BJ)

45.     On January 3, 2007 at approximately 3:36 p.m. EST (all times are EST), Blue Bottle

began buying 200 BJ Jan07 30 put contracts, which represented 34% of the BJ Jan07 30 put

contracts traded on that day. The put contracts were set to expire on January 20, 2007.

When Blue Bottle bought the put contracts, they were out-of-the-money. Essentially,

buying the put contracts was a bet that the price of BJ stock would decrease below the strike

price of the put contracts.

46.     On January 4, 2007 at approximately 7:33 a.m. BJ's reduced its fourth quarter

earnings, reported sales, and issued preliminary 2007 guidance. BJ's announced expected

fourth quarter earnings far below its earlier forecasted earnings because of slow sales. BJ's

expected earnings for the next fiscal year were below analysts' forecasts.

47.     At approximately 9:40 a.m. that morning, Blue Bottle began selling the BJ put

contracts for a profit while the market price was below the put option strike price of $30.00.

48.     On January 4, 2007, the volume of trading in BJ increased approximately 355% from the prior trading day.  BJ closed at $30.55, down $1.31, or a drop of approximately 4%, from the prior close.

49.     As a result of this trading, Blue Bottle garnered a profit of approximately $12,630.

## Trading in LeCroy Corporation (LCRY)

50.     On January 9, 2007 at approximately 2:44 p.m., Blue Bottle began selling short 10,000 shares of LCRY, which essentially was a bet that the price of LCRY would decrease.

51.     On January 10, 2007 at approximately 6:57 a.m., LeCroy Corporation announced its preliminary second quarter financial results and revised its fiscal year 2007 guidance. LeCroy expected to report a GAAP operating loss of about $8 million for its second fiscal quarter and lowered its 2007 revenue estimate below analysts' expectations due to slower sales.

52.     At approximately 7:02 a.m. Blue Bottle began to cover the shorted LCRY position.

53.     On January 10, 2007, the volume of trading in LCRY increased approximately 369% from the prior trading day.  LCRY closed at $10.35, down $1.08, or a 9% drop from the prior close.

54.     As a result of this trading, Blue Bottle garnered a profit of approximately $18,259.

## Trading In Hornbeck Offshore Services, Inc. (HOS)

55.     On January 10, 2007 at approximately 1:29 p.m., Blue Bottle began buying 250

HOS Jan07 35 put contracts, which represented 42% of the HOS Jan07 35 put contracts

traded on that day. The put contracts were set to expire on January 20, 2007. When Blue

Bottle bought the put contracts, they were in-the-money. Essentially, buying the put

contracts was a bet that the price of HOS would decrease.

56.     At approximately 6:07 p.m. that day, HOS lowered its guidance for the fourth

quarter and calendar year 2006. HOS lowered its per share quarterly guidance and indicated

problems that were impacting, and would continue to impact, its operating environment.

HOS also stated that it might have to adjust downward its 2007 guidance by as much as

20%.

57.     The next morning, January 11, 2007, at approximately 10:08 a.m., Blue Bottle began

selling the HOS Jan 35 put contracts for a profit.

58.     On January 11, 2007, the volume of trading in HOS increased approximately

3,664% from the prior trading day. HOS closed at $26.14, down $7.37, or a 22% drop from

the prior close.

59.     As a result of this trading, Blue Bottle garnered a profit of approximately $177,560.

## Trading In Symantec Corporation (SYMC)

60.     On January 12, 2007 at approximately 1:03 p.m. EST, Blue Bottle began buying

10,000 SYMC Jan07 20 put contracts, which represented 20% of the SYMC Jan07 20 put

contracts traded on that day. When Blue Bottle bought the put contracts, they were out-of-

the-money. Essentially, buying the put contracts was a bet that the price of SYMC would

decrease below the strike price of the put contracts. At approximately 1:37 p.m. EST, Blue

Bottle began buying 500 SYMC Jan07 22.5 put contracts, which represented 41% of the SYMC Jan07 22.5 put contracts traded on that day. When Blue Bottle bought these put contracts, they were in-the-money. Essentially, buying these put contracts was a bet that the price of ODSY would decrease. All of the put contracts were set to expire on January 20, 2007.

61.     On the next trading day, January 16, 2007, at approximately 7:48 a.m., Symantec issued a downward revision of its third quarter 2007 earnings and revenue forecast. Symantec announced that its expected third quarter revenue and earnings would be lower than previously forecast. Symantec also announced more conservative guidance for the rest of the fiscal year.

62.     At approximately 9:30 a.m. that day, Blue Bottle began selling the SYMC Jan07 20 put contracts, which resulted in a profit of approximately $944,970. At approximately 9:32 a.m., Blue Bottle began selling the SYMC Jan07 22.5 put contracts, which resulted in an additional profit of approximately $85,501.

63.     On January 16, 2007, the volume of trading in SYMC increased approximately 232% from the prior trading day. SYMC closed at $17.79, down $2.69, or a drop of approximately 13%, from the prior close.

64.     As a result of this trading, Blue Bottle amassed a profit of approximately $1,030,471.

## Trading In CACI International (CAI)

65.     On January 16, 2007 at approximately 2:39 p.m., Blue Bottle began buying 100 CAI Jan07 55 put contracts, which represented 50% of the CAI Jan07 55 put contracts traded on that day.

66. The next morning, January 17, 2007, at approximately 9:35 a.m, Blue Bottle began buying an additional 400 CAI Jan07 55 put contracts, which represented approximately 44% of the CAI Jan07 55 put contracts traded on that day. Blue Bottle had a total position of 500 CAI Jan07 55 put contracts. When Blue Bottle bought the put contracts, they were out-of-the-money. Essentially, buying the put contracts was a bet that the price of CAI would decrease below the strike price of the put contracts. At approximately 2:34 p.m. that day, Blue Bottle began buying 200 CAI Jan07 55 call contracts, which represented 36% of the CAI Jan07 55 call contracts traded on that day. When Blue Bottle bought the call contracts, they were in-the-money. All of the puts and calls were set to expire on January 20, 2007. At approximately 2:34 p.m., Blue Bottle also began selling short 20,000 shares of CAI.

67. At approximately 5:00 p.m. that day, CACI updated its fiscal year 2007 guidance, lowering estimates. CACI reduced its revenue guidance and its per-share earnings forecast for 2007, and the per-share revenue was lower than analysts' expectations. The revised, lower guidance resulted from reductions in contract demand. CACI said second quarter results were expected to be at the low end of its earlier guidance.

68. The next morning, January 18, 2007, at approximately 4:44 a.m., Blue Bottle began covering the shorted CAI position, which resulted in a profit of approximately $162,158. At approximately 9:41 a.m., Blue Bottle began selling the CAI Jan07 55 put contracts, which resulted in an additional profit of approximately $381,700. At approximately 9:45 a.m., Blue Bottle submitted limit orders to sell the CAI call options, but the options were not sold and expired on January 20, 2007, which resulted in a loss of approximately $16,700.

69.     On January 18, 2007, the volume of trading in CAI increased approximately 1,131% from the prior trading day. CAI closed at $47.22, down $7.88, or a drop of approximately 14%, from the prior close.

70.     As a result of this trading, Blue Bottle garnered a profit of approximately $527,158.

Trading In AllianceBernstein (AB)

71.     On January 24, 2007 at approximately 3:50 p.m., Blue Bottle began buying 200 AB Feb07 90 call contracts, which represented 30% of the AB Feb07 90 call contracts traded on that day. The call contracts were set to expire on February 17, 2007. When Blue Bottle bought the call contracts, they were out-of-the-money. Essentially, buying the call contracts was a bet that the price of AB would increase above the strike price of the call contracts.

72.     A few minutes later, at approximately 4:04 p.m., AllianceBernstein announced positive financial and operating results for the fourth quarter and year. AllianceBernstein's fourth quarter profit beat analysts' forecasts by more than 25%, its performance fees were twice that of the same quarter the previous year, and assets under management increased from the previous year by 25%. According to the release, AllianceBernstein's earnings were up by 45%.

73.     The next morning, January 25, 2007, at approximately 9:33 a.m., Blue Bottle began selling the AB Feb07 90 calls for a profit.

74.     On January 25, 2007, the volume of trading in AB increased approximately 147% from the prior trading day. AB closed at $90.44, up $1.03, or an increase of approximately 1%, from the prior close.

75.     As a result of this trading, Blue Bottle garnered a profit of approximately $21,025.

### Trading In Odyssey Healthcare (ODSY)

76.     On January 26, 2007 at approximately 11:55 a.m. EST, Blue Bottle began buying

200 ODSY Feb07 15 put contracts, which represented approximately 50% of the ODSY

Feb07 15 put contracts traded on that day.  When Blue Bottle bought these put contracts,

they were in-the-money.  Essentially, buying these put contracts was a bet that the price of

ODSY would decrease.  Approximately a minute later, Blue Bottle began to submit orders

to buy 401 ODSY Feb07 12.5 put contracts, which represented 50% of the ODSY Feb07

12.5 put contracts traded on that day.  When Blue Bottle bought these put contracts, they

were out-of-the-money.  Essentially, buying these put contracts was a bet that the price of

ODSY would decrease below the strike price of the put contracts.  All of the put contracts

were set to expire on February 17, 2007.

77.     On the next day trading day, January 29, 2007, at approximately 9:30 a.m., Blue

Bottle began selling short 95,200 shares of ODSY stock.  At approximately 9:35 a.m., Blue

Bottle began buying an additional 99 ODSY Feb 12.5 put contracts, which represented

approximately 15% of the ODSY Feb 12.5 put contracts traded on that day.  Blue Bottle's

total position was 500 ODSY Feb07 12.5 put contracts.  At approximately 3:26, Blue Bottle

also bought an additional 50 ODSY Feb07 15 put contracts, which represented 100% of the

ODSY Feb07 15 put contracts traded on that day.  Blue Bottle's total position was 250

ODSY Feb07 12.5 put contracts.

78.     At approximately 4:00 p.m. when the market closed that day, Blue Bottle began to

submit orders, primarily limit orders, to cover the shorted ODSY position that were not

executed until the next day, if at all.

79.    That night at approximately 7:24 p.m., Odyssey Healthcare announced fourth

quarter and year end results and provided negative guidance for 2007. Odyssey Healthcare

expected reduced earnings per diluted share from continuing operations for the fourth

quarter and for 2006, and the expected earnings were lower than analysts' expectations. For

2007, the expected earnings per share also were lower than analysts' expectations for the

forecasted level of revenue.

80.    The next morning, January 30, 2007, at approximately 4:56 a.m., Blue Bottle

continued to cover the shorted ODSY stock position, which resulted in a profit of $70,715.

At approximately 9:30 a.m., Blue Bottle began selling the ODSY Feb07 12.5 puts (when the

stock was below the 12.5 strike price), which resulted in a profit of approximately $11,155,

and began selling the ODSY Feb07 15 puts, which resulted in an additional profit of

approximately $25,155.

81.    On January 30, 2007, the volume of trading in ODSY increased approximately

175% from the prior trading day. ODSY closed at $12.59, down $0.75, or a drop of

approximately 6%, from the prior close.

82.    As a result of this trading, Blue Bottle garnered a total profit of approximately

$107,025.

### Trading In Millipore Corporation (MIL)

83.    On February 1, 2007, at approximately 3:50 pm., Blue Bottle began buying 300 MIL

Feb07 65 call contracts, which represented 100% of the MIL Feb07 65 call contracts traded

on that day. When Blue Bottle bought these call contracts, they were in-the-money. At the

same time, Blue Bottle began buying 100 MIL Feb07 70 call contracts, which represented

11% of the MIL Feb07 70 call contracts traded on that day. When Blue Bottle bought these

call contracts, they were out-of-the-money. Essentially, buying the call contracts was a bet that the price of MIL would rise. The call contracts were set to expire on February 17, 2007. At the same time, Blue Bottle also began buying 20,000 shares of MIL stock.

84. At approximately 4:00 p.m. when the market closed, stopped buying shares of MIL stock and began submitting limit orders to sell the MIL stock, but none of the trades were executed until the next day, if at all.

85. Within minutes, at approximately 4:03 p.m., Millipore announced strong fourth quarter and year end results. Revenues for the fourth quarter grew 49% and were higher than analysts' expectations, and revenues for the full year grew 27%. Non-GAAP net income for the fourth quarter grew approximately 50% and was higher than analysts' expectations, and non-GAAP net income for the year grew 24%. Earnings in 2007 were forecasted to meet or exceed analysts' estimates.

86. The next morning, February 2, 2007, at approximately 9:27 a.m., Blue Bottle began selling the MIL stock for a profit of approximately $108,675. At approximately 9:38 a.m., Blue Bottle began selling the MIL Feb07 65 call contracts for a profit of approximately $147,800. At approximately 9:39 a.m., Blue Bottle began selling the MIL Feb07 70 calls for a profit of approximately $32,705.

87. On February 2, 2007, the volume of trading in MIL increased approximately 675% from the prior trading day. MIL closed at $75.25, up $5.73, or an increase of approximately 8%, from the prior close.

88. As a result of this trading, Blue Bottle garnered a profit of approximately $289,180.

## Trading In Brady Corporation (BRC)

89.     On February 8, 2007 at approximately 2:31 p.m., Blue Bottle began selling short

68,100 shares of BRC stock and continued to sell short almost up until the market closed.

90.     At 4:10 p.m. that day, Blue Bottle submitted limit orders to begin covering its

shorted BRC position, but the orders were not executed until the next day, if at all.

91.     At approximately 5:10 p.m., Brady reported preliminary results for its second

quarter. Brady expected that its second quarter earnings would be below analysts'

estimates. Brady also reduced its estimated net income for the year, and the estimate also

was below analysts' expectations.

92.     The next morning, February 9, 2007, at approximately 9:07 a.m. that morning, Blue

Bottle began covering the shorted BRC position for a profit.

93.     On February 9, 2007, the volume of trading in BRC increased approximately 422%

from the prior trading day. BRC closed at $34.81, down $3.56, or a drop of approximately

9%, from the prior close.

94.     As a result of this trading, Blue Bottle garnered a profit of approximately $224,051.

## Trading In Achillion Pharmaceuticals (ACHN)

95.     On February 8, 2007 at approximately 11:37 a.m., Blue Bottle began selling short

1,000 shares of ACHN stock.

96.     At approximately 4:00 p.m. when the market closed, Blue Bottle began to submit

primarily limit orders to cover a fraction of the shorted ACHN position, but the orders were

not executed until the next day, if at all.

97.     At 4:24 p.m. that day, Achillion Pharmaceuticals announced it was discontinuing the

development of a drug because initial results showed a negative impact on kidney function.

98.     The next morning, February 9, 2007, at approximately 5:21 a.m., Blue Bottle continued to cover the shorted ACHN position for a profit.

99.     On February 9, 2007, the volume of trading in ACHN increased approximately 3,766% from the prior trading day.  ACHN closed at $8.87, down $9.12, or a drop of approximately 51%, from the prior close.

100.    As a result of this trading, Blue Bottle garnered a profit of approximately $9,117.

Trading in Allscripts Healthcare Solutions (MDRX)

101.    On February 13, 2006 at approximately 3:56 p.m., Blue Bottle began selling short 32,227 shares of MDRX stock.

102.    At approximately 4:00 p.m. when the market closed, Blue Bottle stopped selling short and began submitting orders, initially primarily limit orders, to cover the shorted MDRX position.

103.    A minute later, at approximately 4:01 p.m., Allscripts reported fourth quarter 2006 results, which overall included negative information.  Allscripts' fourth quarter profit increased 32%, but acquisition costs offset gains, earnings barely met analysts' expectations, and revenue was lower than analysts' expectations.

104.    By approximately 4:18 p.m. that day, Blue Bottle had covered the shorted MDRX position for a profit.

105.    The volume of trading in MDRX increased approximately .09% from the prior trading day.  MDRX closed at $29.00, down $.07, or a drop of approximately .2%, from the prior close.

106.    As a result of this trading, Blue Bottle garnered a profit of approximately $32,598.

## Trading in RealNetworks (RNWK)

107.    On February 14, 2007 at approximately 3:49 p.m., Blue Bottle began selling short 250,000 shares of RNWK stock. At approximately 3:58 p.m., Blue Bottle began buying 498 RNWK Feb07 10 put contracts, which represented approximately 40% of the RNWK Feb07 10 put contracts traded on that day. When Blue Bottle bought the put contracts, they were in-the-money. Essentially, buying the put contracts was a bet that the price of RNWK would decrease. The put contracts were set to expire on February 17, 2007.

108.    Approximately two minutes later when the market closed at 4:00 p.m., Blue Bottle stopped selling short and began submitting orders, primarily limit orders, to cover the shorted RNWK position. Most of the orders were not executed until the next day, if at all.

109.    On February 14, 2007 at approximately 4:05 p.m., RealNetworks announced fourth quarter and 2006 results. While fourth quarter revenue grew 50% and fourth quarter earnings and revenue exceeded analysts' estimates, the projected revenue for 2007 was below analysts' projections.

110.    On February 15, 2007, at approximately 4:17 a.m., Blue Bottle continued covering the shorted RNWK position (initially continuing to submit limit orders), which resulted in a profit of $277,812. At approximately 9:30 a.m., Blue Bottle sold the RWNK Feb07 10 put contracts for a profit of $14,180.

111.    On February 15, 2007, the volume of trading in RNWK increased approximately 396% from the prior trading day. RNWK closed at $8.97, down $1.70, or a drop of approximately 16%, from the prior close.

112.    As a result of this trading, Blue Bottle garnered a profit of $291,992.

**Defendants Appear To Have Been Trading Upon Stolen, Non-Public Information**

113.    Given the disparate companies in which the Defendants traded, the nature of the

Defendant's trading, the number of times Defendants profited from trading shortly before

news releases, and amount of profits the trading generated, the Commission believes, and

avers, that the Defendants employed devices, schemes, or artifices to defraud, which may

include, but may not be limited to, hacking into computer networks or otherwise improperly

obtaining electronic access to systems that contained material, non-public information about

imminent news releases, and traded on the basis of such non-public information.

114.    The staff of the Commission is conducting an ongoing investigation in an attempt to

determine how the Defendants obtained the non-public information and to determine

whether the Defendants used non-public information in other trades.

**Defendants Made Over $2.7 Million Through Their Fraudulent Scheme**

115.    The Defendants began trading through Blue Bottle's brokerage account in

approximately mid-November 2006.

116.    Since the beginning of January, the Defendants have traded just before news releases

and at least 12 times in that limited period have amassed significant profits.

117.    During this period, the Defendants did incur losses in some instances where they

traded just before news releases, but the profits are significantly greater than the losses that

the Defendants incurred.

118.    Since January 2007, the Defendants amassed approximately $2,707,177 by trading

just before news releases.

119.    Blue Bottle's account at Interactive Brokers was funded on November 15, 2006 through an electronic transfer of approximately $500,000 from a Bank of Cyprus Limited bank account in Nicosia, Cyprus. The money was transferred from a Bank of Cyprus account that Blue Bottle identified as its account in the account opening documents at Interactive Brokers. On December 1, 2006, another electronic transfer of approximately $160,000 was made from the same Bank of Cyprus bank account. In total, approximately $660,000 has been deposited into the account at Interactive Brokers.

120.    On January 16, 2007, the Interactive Brokers account was worth in excess of $1 million. That day, Blue Bottle requested that $600,000 be transferred from the Interactive Broker account to its Bank of Cyprus account. The money was transferred on January 17, 2007.

121.    On January 18, 2007, the Interactive Brokers account was again worth in excess of $1 million because of additional profitable trades. That day, Blue Bottle requested that $700,000 be transferred from the Interactive Broker account to the Bank of Cyprus account, and the money was transferred the same day.

122.    The Defendants continued to trade in advance of new releases. As of February 21, 2007, the Blue Bottle account had a balance of approximately $1,650,250.

123.    On February 20, 2007, Defendants requested another withdrawal from the Interactive Brokers account.

## FIRST CLAIM FOR RELIEF

### Violations Of Section 17(a) of the Securities Act

124.    Plaintiff repeats and realleges paragraphs 1 through 123 above.

125.    Defendants Blue Bottle and Stokes knowingly, recklessly, or negligently, in the offer

or sale of securities, directly or indirectly, by use of the means or instrumentalities of

interstate commerce or of the mails, or a facility of a national securities exchange: (a)

employed devices, schemes or artifices to defraud; (b) obtained money by means of untrue

statements of material fact or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading;

and (c) engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon any person in connection with the offer or sale of any

security.

126.    By engaging in the foregoing conduct, Defendants Blue Bottle and Stokes violated

Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

127.    Plaintiff repeats and realleges paragraphs 1 through 123 above.

128.    Defendants Blue Bottle and Stokes knowingly or recklessly, in connection with the

purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities

of interstate commerce or of the mails, or a facility of a national securities exchange: (a)

employed devices, schemes or artifices to defraud; (b) obtained money by means making

untrue statements of material fact, or omitting to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not

misleading; and; and (c) engaged in acts, practices, or courses of business which operated or

would operate as a fraud or deceit upon any person in connection with the purchase or sale

of any security.

129.   Defendants Blue Bottle and Stokes knew or recklessly disregarded the fact that they possessed material non-public information concerning the securities described above.

130.   By engaging in the foregoing conduct, Defendants Blue Bottle and Stokes violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

**WHEREFORE**, the Commission respectfully requests that this Court:

## I.

Permanently enjoin the Defendants, and their agents, officers, servants, employees, attorneys, and those persons in active concert or participation with them, directly or indirectly, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## II.

Order the Defendants account for and to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint.

## III.

Order the Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C.§ 78u(d)(3) and § 78u-1], in an amount to be determined by the Court.

**IV.**

Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Robert B. Blackburn (RB 1545)
Securities and Exchange Commission
3 World Financial Center, Room 4300
New York, New York 10281-1022
(212) 336-1050 [Blackburn]
(212) 336-3317 [FAX]
BlackburnR@SEC.GOV

Jordan A. Thomas
Fredric D. Firestone
Kenneth R. Lench
Douglas C. McAllister
Melissa E. Lamb
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 200549
(202) 551-4475 [Thomas]
(202) 772-9245 [Thomas FAX]

Attorneys for Plaintiff

Dated: February 26, 2007